## McKEE v DEPARTMENT OF SOCIAL SERVICES

Docket No. 73470. Argued April 3, 1985 (Calendar No. 9).—Decided December 30, 1985. Released February 11, 1986.

Gary McKee and Lucinda Johndro, recipients of Aid to Families With Dependent Children, were separately notified by the Department of Social Services that they were ineligible for benefits because each of them owned an interest in nonhomestead real property having a market value in excess of the limit permitted. The termination of benefits was upheld in each case following administrative proceedings, and the plaintiffs jointly appealed in the Bay Circuit Court on behalf of themselves and all other persons similarly situated. The court, John X. Theiler, J., affirmed. The Court of Appeals, DANHOF, C.J., and BRONSON and PETERSON, JJ., affirmed in an opinion per curiam (Docket No. 62645). The plaintiffs appeal.

In an opinion by Justice LEVIN, joined by Chief Justice WILLIAMS and Justices BRICKLEY, CAVANAGH, and BOYLE, the Supreme Court *held:*

An interest of an applicant for or recipient of Aid to Families With Dependent Children in real property, not marketable after good-faith efforts to sell, is not an available resource for purposes of the AFDC limitation on resources of applicants or recipients in effect at the time of the plaintiffs' claims.

1. A state, in administering the Aid to Families With Dependent Children program, must, in determining eligibility for benefits, consider the resources and income of an applicant or recipient. In Michigan, Department of Social Services regulation provides that only income and resources available in fact for current use may be considered in determining eligibility. This indicates that the department itself understood that only those resources that can in fact be used for support and maintenance are includable in determining whether the resource limitation has been exceeded.

2. Requiring applicants or recipients of benefits to dispose of

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] Am Jur 2d, Welfare and Welfare Laws §§ 6-24, 57.

Eligibility for welfare benefits, under maximum-assets limitations, as affected by expenditures or disposal of assets. 19 ALR4th 146.

resources for less than fair market value to maintain eligibility would be inconsistent with the goal of self-sufficiency of the AFDC program. In this case, there was no allegation that the plaintiffs were unwilling to convert their interests in nonhomestead real property into cash. The properties were listed for sale, and, when they did not sell, the prices were reduced.

Reversed and remanded.

Justice Ryan, joined by Justice Riley, dissenting, stated that the determination by the Department of Social Services that real property owned but not occupied by recipients of benefits under the Aid to Families With Dependent Children program was a resource available for current use so as to make the recipients ineligible for benefits did not violate applicable state and federal statutes and regulations and was not error requiring reversal.

131 Mich App 422; 346 NW2d 105 (1984) reversed.

### OPINION OF THE COURT

1. SOCIAL SECURITY — AID TO FAMILIES WITH DEPENDENT CHILDREN — NONHOMESTEAD REAL PROPERTY — GOOD-FAITH EFFORTS TO SELL.

An interest of an applicant for or recipient of Aid to Families With Dependent Children in real property, not marketable after good-faith efforts to sell, was not an available resource for purposes of the AFDC limitation on resources of applicants or recipients (42 USC 603 *et seq.;* 45 CFR 233.20; MCL 400.56g[1][a]; MSA 16.456[7][1][a]; 1979 AC, R 400.12[10]).

### DISSENTING OPINION BY RYAN, J.

2. SOCIAL SECURITY — AID TO FAMILIES WITH DEPENDENT CHILDREN — NONHOMESTEAD REAL PROPERTY — GOOD-FAITH EFFORTS TO SELL.

*Consideration by the Department of Social Services of the equity interest in nonhomestead real property of certain recipients of benefits under the Aid to Families With Dependent Children in determining that the recipients were no longer eligible for aid, even though the recipients were making good-faith efforts to sell the property, was not violative of state and federal statutes and regulations applicable at the time the determination was made (42 USC 602 et seq., 1320, 1382b[b]; 45 CFR 233.20; MCL 400.56g[1][a]; MSA 16.456[7][1][a]; 1979 AC, R 400.12[10]).*

Legal Services of Eastern Michigan (by *Michael Malkovich*) for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Erica Weiss Marsden,* Assistant Attorney General, for the defendant.

LEVIN, J. The question presented is whether the Department of Social Services, charged with implementing and administering the Aid to Families With Dependent Children program may, consistently with federal and state law, deem an interest in real property held by an applicant or recipient to be "available" for support and maintenance, and hence countable in computing dollar-amount resource limits governing eligibility for benefits, whenever there is no legal impediment to the sale of the interest, although the applicant or recipient, despite good-faith efforts, has not been able to convert the interest to cash that could be used to feed, shelter, and clothe the applicant's or recipient's children.[1] We hold that an interest in real

---

[1] The McKees were divorced in March, 1981. Pursuant to the divorce decree, the marital home was to be sold and the proceeds evenly divided between them. Mrs. McKee was granted exclusive use of the former marital home until it was sold, and Mr. McKee resided at a different residence with his two minor children. The home was first listed for sale in February, 1981, at $32,900. The price was reduced in April to $29,900, and again in May to $25,900. In March, 1981, the Bay County Department of Social Services learned that Mr. McKee and his children no longer lived in the former marital home and determined that they were therefore no longer eligible for AFDC benefits because they considered Mr. McKee's interest in the former marital home an available nonexempt asset, thereby causing his total assets to exceed the AFDC resource limitation. The local Bay County office, however, determined that Mr. McKee had no income, that he could not sell his home, and that closing his AFDC case would cause undue hardship for him and his two children. The office requested a policy exception permitting Mr. McKee to continue to receive AFDC benefits until his home could be sold.

The request for an exemption was denied by the central state office in April, 1981. Shortly thereafter, Mr. McKee filed a timely request for an administrative hearing, which was held on May 26, 1981. The hearing referee found that Mr. McKee was making a good-faith effort to sell his home and that the termination of benefits would cause undue hardship to his children. The referee concluded that the

interest in the former marital home was not a resource available for current use pursuant to 1979 AC, R 400.12(10), and that the AFDC benefits should not be terminated.

The Policy Hearing Authority of the DSS, which reviews such decisions, adopted the findings of fact of the referee, but concluded as a matter of law that the action of the local department was not in conflict with state or federal law and upheld the decision to terminate the benefits.

McKee appealed to the circuit court. The parties agreed to dismiss the appeal and to the remand of the matter for an additional administrative hearing. Between the two hearings, McKee continued to lower the price of the home in an effort to sell it.

At the second hearing, the referee again found that Mr. McKee was making a good-faith effort to dispose of the home, that the purchase price had been continually reduced since the first hearing, and that a contingent offer to purchase had been accepted in October, 1981, for $19,900. He also found that Mr. McKee's equity exceeded the $1,000 limit, but ruled that the property could not be considered an "available" asset until it was sold, unless Mr. McKee interfered with efforts to sell the property. The referee concluded that the department could not cancel the AFDC benefits and recommended that the department's actions be reversed.

The policy hearing authority then received and adopted the findings of fact of the referee, but concluded that the former marital property was available for support and maintenance, and that therefore McKee and his children were ineligible for AFDC benefits.

McKee appealed to the circuit court. By stipulation of the parties, McKee's AFDC benefits were reinstated, retroactive to the date of his last AFDC payment, and the matter was remanded for further hearing before the DSS to determine whether Mr. McKee's ex-wife was unwilling to lower the asking price of the property to a price at which the property could be sold. It was established at the second hearing that Mr. McKee and his wife accepted the offer of $19,900 on October 10, 1981. On or about October 19, Mr. McKee received about $2,000 as his share of the proceeds. The resource limit at that time was $1,000.

In oral argument in the circuit court, Mr. McKee acknowledged through his attorney that due to the continuation of AFDC benefits throughout the hearing process and the stipulation to continue benefits pending final administrative decision after the remand hearing, he was not deprived of any AFDC benefits as a result of the department's determination that he owned resources in excess of the eligibility limits.

Lucinda Johndro also owned a home with her husband. Upon separation from her husband, she moved with her son from the home. In June, 1981, the home was listed for sale at an estimated market value of $35,000. The indebtedness on the property was $14,000. In July, 1981, the Midland County Department of Social Services determined that she was ineligible for AFDC benefits because her interest in the former home was deemed an available asset exceeding the AFDC assets limit. The department's termination action was upheld in an administrative decision issued on October 14, 1981. The referee found

property, not marketable after good-faith efforts to sell, is not an "available" resource for purposes of the AFDC limitation in effect at the time of the plaintiffs' claims.

I

The AFDC program was established by the Social Security Act.[2] It is financed in large measure by the federal government on a matching-fund basis. Participating states are required to submit AFDC plans in conformity with the act and regulations promulgated by the secretary of Health and Human Services. To be approved by the secretary, a state plan must meet the specifications set out in the act,[3] which include, for the purpose of determining eligibility, consideration of the resources and income of an applicant or recipient. The state agency administering the AFDC program compares the family's income to a standard of need set by the state, and measures the family's resources and income against a national standard.[4]

A federal regulation[5] establishes guidelines for the implementation of the act[6] and requires state

that, although the Johndros were making a good-faith effort to sell the home, he was bound by the decision of the policy hearing authority in *McKee* and that the termination of benefits would have to be upheld.

McKee and Johndro sought to appeal the decisions to the circuit court on behalf of a class of persons similarly situated. The class was not certified.

[2] 42 USC 601-609, added in 1939, 53 Stat 1379.

[3] 42 USC 602(a) (Supp III 1973).

[4] Each state has the power to determine standards of need and the level of benefits (*King v Smith*, 392 US 309, 318-319; 88 S Ct 2128; 20 L Ed 2d 1118 [1968]) and may protect the interest of recipients by setting a higher standard of need. See *Nat'l Welfare Rights Organization v Mathews*, 174 US App DC 410, 418; 533 F2d 637 (1976).

[5] 45 CFR 233.20(a)(3)(ii)(D).

[6] Effective October 1, 1981, 42 USC 602(a)(7) was amended by the Omnibus Budget Reconciliation Act of 1981, PL 97-35; 95 Stat 859, to provide:

plans to take into consideration the resources and income of the applicant or recipient:

> Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance.

The Director of the DSS is also authorized to promulgate regulations concerning the AFDC program.[7] Pursuant to that authority, the director promulgated the following regulation:[8]

> Only income and resources which are available *in fact* for current use are to be considered in determining the need of individuals for assistance and the amount of payments to or for them. [Emphasis supplied.]

## II

Homestead real property is exempt from the

"(a) A State plan for aid and services to needy families with children must . . .

"(7) except as may be otherwise provided in paragraph (8) or (31) and section 615 of this title, provide that the State agency—

"(A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid;

"(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, but not including as a resource for purposes of this subparagraph (i) a home owned and occupied by such child, relative, or other individual and so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe . . . ."

[7] MCL 400.10; MSA 16.410.

[8] 1979 AC, R 400.12(10).

resource limitation.[9] The question presented is whether it was proper for the DSS to include as "available" resources interests in "nonhomestead" real property, former marital homes in which the recipients were no longer residing and to which they had no intention of returning.

The plaintiff recipients contend that their real property interests were, although there was no formal legal barrier to sale, not in reality available to meet their current needs for support and maintenance.[10] The DSS contends that neither the federal nor the state regulation provides for a grace period during which, if a good-faith effort is made to dispose of the property, the property will be excluded from the determination of available resources. The DSS claims that a 1984 amendment of the act,[11] authorizing the promulgation of a

---

[9] See n 6.

[10] The dissenting opinion notes that it is not proper to focus on the applicant's legal right or legal ability to dispose of an asset. HEW rejected such a construction of availability in 1975, preferring a definition that focused on the actual, not legal, availability of a resource. Any reliance on the "liquidated sum" clause of the definition of availability in 45 CFR 233.20(a)(3)(ii)(D) is therefore misguided. See *Galster v Woods* (*On Rehearing*), 173 Cal App 3d 529, 543; 219 Cal Rptr 500 (1985); *Miller v Stumbo*, 661 SW2d 1 (Ky App, 1983).

[11] Effective October 1, 1984, 42 USC 602(a)(7)(B) was amended by the Deficit Reduction Act of 1984, PL 98-369; 98 Stat 494, to provide:

"A State plan for aid and services to needy families with dependent children must—

\* \* \*

"(7) except as may be otherwise provided . . . , provide that the State agency—

\* \* \*

"(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, *but not including as a resource* for purposes of this subparagraph . . . .

\* \* \*

"(iii) *for such period or periods of time as the Secretary may prescribe, real property which the family is making a good-faith effort*

regulation allowing a grace period of six or nine months, demonstrates that when the disputes arose in these cases, before that amendment, the federal policy was that states were not required to provide grace periods.

The DSS relies on a statement in a congressional committee report:

> The conference agreement follows the House bill with a modification *establishing* an AFDC policy on real property that is similar to SSI [Social Security Insurance] policy. The managers intend that by regulation, real property, which the family is making a good-faith effort to sell, would be exempt for six months (with State option for an additional 3 months) but only if the family agrees to use the proceeds from the sale to repay the AFDC paid. Any remaining proceeds would be considered a resource. [H Rep 98-861, 98th Cong 2d Sess, 1395-1396 (1984); 1984 US Code Cong & Ad News 2083-2084. Emphasis supplied.]

On the basis of this statement, the dissenting opinion concludes that the Congress, before the enactment of the 1984 amendment, did not require a state to provide a grace period. Although grace periods were provided in some states, they were not required.

*to dispose of,* but any aid payable to the family for any such period shall be conditioned upon such disposal, and any payments of such aid for that period shall (at the time of the disposal) be considered overpayments to the extent that they would not have been made had the disposal occurred at the beginning of the period for which the payments of such aid were made."

The secretary then promulgated the current federal regulation which states:

"A State Plan for . . . AFDC . . . must

"(3)(i)(A) Specify the amount and types of real and personal property, including liquid assets, that may be reserved, i.e., retained to meet the current and future needs while assistance is received on a continuing basis."

## III

The idea that a state should consider only income and resources actually available, known as the "availability principle," is well-established in AFDC law. A 1940 Social Security Board Policy Statement required that a resource "actually exist," not be "fictitious" or "imputed" and "be actually on hand or ready for use when it is needed."[12] The "purpose [of the availability principle] is to prevent the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need." *Heckler v Turner*, 470 US 184, 201; 105 S Ct 1138; 84 L Ed 2d 138 (1985). This means that resources are available if they may be used today to provide food, clothing, and shelter.[13]

The DSS contends that, by codifying grace periods as an exception within a general rule of ineligibility, the Congress indicated its preamendment intent was to deem nonexcluded real property interests to be currently available without regard to whether they were readily convertible into cash. Even if the 1984 amendment purported to clarify the intent of the 1981 Congress, which it did not,[14] such an assessment of the intent of the members

---

[12] See *Heckler v Turner, supra.*

[13] There is a difference between an interest in a resource and an interest in the cash or cash equivalent *resulting from its sale.* Regulation 45 CFR 233.20(a)(3)(ii)(F)(4) provides that "[l]iquid assets are those properties in the form of cash or other financial instruments which are convertible to cash and include savings accounts, checking accounts, stocks, bonds, mutual fund shares, promissory notes, mortgages, cash value of insurance policies, and similar properties . . . ." This definition makes plain the difference between the "liquidated sum" referred to in the availability definition of 45 CFR 233.20(a)(3)(ii)(D), and real property assets which are, at best, *liquidable.* See *Schrader v Idaho Dep't of Health & Welfare,* 768 F2d 1107, 1113, n 8 (CA 9, 1985).

[14] See *Schrader,* n 13 *supra.*

of Congress who voted for an earlier enactment would not be conclusive.[15]

Although the committee reports concerning the 1984 amendment might be read as indicating that the act prior to the 1984 amendment did not authorize or require grace periods, they can as readily be read as indicating that the amendment was designed to coordinate the AFDC program's grace period policy, whatever it was, with the policy of the Social Security Insurance program.[16] A California court said:

> Respondents view the good-faith-efforts amendment as Congress' first departure from a priorly inflexible rule of presuming current availability; but appellants will view the amendment as Congress' first constraint (i.e., by time limits and conditioned benefits) on a long standing policy of

[15] See *Consumer Product Safety Comm v GTE Sylvania*, 447 US 102, 117; 100 S Ct 2051; 64 L Ed 2d 766 (1980); *Penn Mutual Life Ins Co v Lederer*, 252 US 523, 537-538; 40 S Ct 397; 64 L Ed 698 (1920).

[16] The only express indication of intent is this brief explanation of the amendment's legislative history:

"*Present law.* . . . Real property is considered as a resource available to the family both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make the sum available for support and maintenance.

"*House bill.* Exempt from the AFDC resource limitation, . . . real property which the household is making a good faith effort to sell at a reasonable price and which has not been sold. Effective October 1, 1984.

"*Senate amendment.* No provision.

"*Conference agreement.* The conference agreement follows the House bill with a modification establishing an AFDC policy on real property that is similar to SSI policy. The managers intend that by regulation, real property which the family is making a good faith effort to sell would be exempt for six months (with State option for an additional 3 months) but only if the family agrees to use the proceeds from the sale to repay the AFDC paid. Any remaining proceeds would be considered a resource." (PL 98-369, House Conference Report No 98-861, pp 1395-1396, 1984 US Code Cong & Ad News 2083-2084.)

The foregoing explanation restates the preexisting law as worded in 45 CFR 233.20(a)(3)(ii)(B), and indicates that the amendments are meant to conform to social security provisions. See *Galster v Woods (On Rehearing)*, n 10 *supra*, 173 Cal App 3d 547, n 15.

looking to actual or practical availability. [*Galster v Woods,* 161 Cal App 3d 85; 207 Cal Rptr 402, 413 (1984).]

The legislative history relied on by the DSS does not support the argument that the 1984 amendment only made sense if prior law did not require grace periods. Reining in the availability principle by conditioning aid on eventual disposition of excess property, and making the aid paid during a grace period recoverable as an overpayment, as is the procedure in other portions of the Social Security Act,[17] would be a sensible reform in an amendment which was part of a "deficit reduction" act.[18] The 1984 amendment brought the AFDC policy in line with SSI policy by allowing grace periods only if the applicant or recipient agreed to pay back benefits from the proceeds.

There is nothing in either the legislative history of the 1984 amendment or in judicial decisions construing that amendment that indicates that the Congress intended to change the availability principle. The United States Supreme Court said that in enacting a 1981 amendment, the Congress implicitly approved the availability principle.[19] The 1984 amendment, rather than indicating a change in congressional policy, reaffirmed the prior understanding of the meaning of the statute and at the same time effected a reduction in unnecessary federal spending.

## IV

In enacting the 1981 and 1984 amendments, the

---

[17] Applicants must agree to repay conditional benefits from the proceeds resulting from the disposal of excess resources to the extent that the net proceeds plus the individual's other assets exceed the SSI eligibility requirement. See 20 CFR 416.1240, 416.1242, 416.1244.

[18] See *Schrader,* n 13 *supra* at 1115.

[19] See *Heckler v Turner, supra,* pp 199-200.

Congress did not intend to require applicants or recipients to liquidate immediately their resources at less than fair market value. This is apparent from the general objectives of the act, which states that the AFDC program is

> [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services . . . to help maintain and strengthen family life and to help such parents or relatives to *attain or retain capability for the maximum self-support* and personal independence consistent with the maintenance of containing parental care and protection . . . .[20] [Emphasis supplied.]

Requiring applicants or recipients to dispose of resources for less than they would bring in fair market transactions[21] would be inconsistent with the self-sufficiency goal of the AFDC program.

To the extent an applicant or recipient is required to dispose of a major resource, such as an interest in realty, at a "distress sale" or for less than the fair market value, the purpose of the act would be undermined. The more money that is received from the sale of a resource, the less money the state and federal government will pay in benefits. To the extent that the sale brings less money than it could have brought, the family may sooner return to the AFDC rolls.

## V

The Michigan regulation—set forth in full at the conclusion of Part I—includes the words "in fact"

[20] 42 USC 601. This overall purpose is supplemented by specific objectives inferable from individual provisions of the act, such as encouraging employment, §§ 602(a)(8), (14), (15), (19). See *Heckler v Turner, supra,* pp 199-200.

[21] See *Schrader,* n 13 *supra* at 1113.

after the word "available"[22] which indicates that the DSS itself understood that only those resources that can in fact be used for support and maintenance are includable in determining whether the resource limitation has been exceeded.

A DSS regulation provides:

> A client shall provide to the department of social services information known to the client about his financial condition, including potential resources and sources of income. A client's potential resources and sources of income, including those to which he is entitled by right and by those which can be legally developed within the client's means or with the assistance of the department or other community resources, are to be developed to a status of availability. Assistance *payments* or services *shall not be withheld* or reduced by the department *because of a client's potential resources* or sources of income *pending their development to a status of availability* unless such development requires action by the client which he is not willing to take. [Emphasis supplied. 1979 AC, R 400.12(7).]

There is no allegation that the plaintiffs were unwilling to convert their properties into cash. They listed the properties for sale, and, when they did not sell, reduced the price.

The Michigan statute provides that AFDC benefits may not be paid to a dependent child or family who has "made an assignment or transfer after the granting of assistance, for the purpose of qualifying for assistance or for the purpose of increasing the amount of assistance to be received under this act." MCL 400.56g(1)(c); MSA 16.456(7)(1)(c). This rule, effectively determining a person to be ineligible for AFDC benefits if he disposes of an

---

[22] See n 8 and accompanying text.

asset for less than fair market value, was sustained by the Court of Appeals.[23]

The DSS has interpreted this provision as meaning that a person is ineligible for AFDC benefits when he has "divested" himself of an asset for less than fair market value. The DSS Assistance Payments Manual states:

Divestment of assets is prohibited and results in ineligibility for ADC/GA. [Item 212, p 1.]

The manual further states:

Divestment exists when *both* elements listed below are present:
1. a client has transferred assets to another person for less than fair market value, *and*
2. such transfer was made with *intent* to qualify for ADC/GA, remaining eligible for ADC/GA, or receive an increase in his grant. [Emphasis in the original. Item 212, p 2.]

The combined effect of the several DSS' interpretations is to place an applicant or recipient between Scylla and Charybdis. If he disposes of an asset at less than fair market value, then he is "divesting" himself of the asset and as such is ineligible. If he is attempting to sell the property for a higher price, then he is ineligible because he is over the asset limitation.

## VI

Although an agency's interpretation of its own regulations is entitled to deference by the courts,[24] its interpretations are not conclusive and do not

---

[23] *Pease v Director, DSS,* 105 Mich App 689; 308 NW2d 432 (1981).

[24] *Quern v Mandley,* 436 US 725, 738; 98 S Ct 2068; 56 L Ed 2d 658 (1978).

bind the courts.[25] The deference due an administrative interpretation depends on its consistency with earlier agency pronouncements,[26] the purpose and wording of other agency regulations,[27] and, most pertinently, the purpose of the relevant statutes.[28]

The federal act bars state regulations "inconsistent with this chapter,"[29] stating that state regulations must advance rather than impede the legislative goals. The DSS' interpretation is inconsistent in two respects. First, "[f]rom the inception of the Act, Congress has sought to ensure that AFDC assistance is provided only to needy families, and that the amount of assistance actually paid is based on the amount needed in the *individual* case after other income and resources are considered."[30] The DSS' interpretation, contrary to the purpose of the statute, would require the determination of need to be made without regard to the individual situation. Second, the DSS' interpretation frustrates the purpose of the act by undercutting a family's ability to provide for itself by encouraging it to sell an asset at less than the fair market value, thereby reducing the proceeds available for maintenance.

Courts have held invalid state policies that include as resources an amount not actually available for maintenance of the applicant or recipient.[31]

[25] *Social Security Bd v Nierotko,* 327 US 358, 369; 66 S Ct 637; 90 L Ed 718 (1946).

[26] *Morton v Ruiz,* 415 US 199, 237; 94 S Ct 1055; 39 L Ed 2d 270 (1974).

[27] *Pacific Coast Medical Enterprises v Harris,* 633 F2d 123, 131 (CA 9, 1980).

[28] *United States v Larionoff,* 431 US 864, 873; 97 S Ct 2150; 53 L Ed 2d 48 (1977).

[29] 42 USC 1302.

[30] *Shea v Vialpando,* 416 US 251, 261; 94 S Ct 1746; 40 L Ed 2d 120 (1974). (Emphasis in the original.)

[31] See, *e.g., Shea v Vialpando,* n 30 *supra* (standard allowance for

## VII

The construction of the statute and regulations set forth in this opinion find support in *Schrader v Idaho Dep't of Health & Welfare,* 768 F2d 1107, 1114 (CA 9, 1985), *Galster v Woods (On Rehearing),* 173 Cal App 3d 529; 219 Cal Rptr 500 (1985), and *Miller v Stumbo,* 661 SW2d 1 (Ky App, 1983).[32]

In *Schrader,* a revised Idaho regulation eliminated grace periods for the disposition of nonliquid assets. The Idaho regulation had been revised in accord with a policy adopted by the secretary following the 1981 amendment. That policy prohibited a grace period during which an applicant could make a good-faith effort to liquidate excess

work-related expenses); *Lewis v Martin,* 397 US 552; 90 S Ct 1282; 25 L Ed 2d 561 (1970) (possible support from nonadoptive stepfather); *Nat'l Welfare Rights Organization v Mathews,* n 4 *supra* (valuing resources at their market value regardless of encumbrances); *Johnson v Harder,* 383 F Supp 174 (D Conn, 1974), *aff'd* 512 F2d 1188 (CA 2, 1975), *cert den* 423 US 876 (1975) (surplus OASDI benefits).

[32] In *Miller v Stumbo,* AFDC benefits were discontinued when it was discovered that the recipient owned a one-third interest (worth $1,867) in nonincome producing property valued at $5,600. Her interest exceeded the federal limit of $1,000, and she was therefore found to be ineligible in administrative proceedings, although the property had been placed on the market for sale and was difficult to sell due to needed repairs. Relying on the language of the federal regulation (45 CFR 233.20[a][3][ii][D]), the Kentucky Court of Appeals reversed the trial court's affirmance of the administrative appeal board's order, finding that insufficient probative evidence supported the board's order. Concluding that the proceeds of the sale were not yet *actually available* to Miller, the court noted that she had a "legal interest" in the property and the "theoretical legal ability to make it available for support and maintenance," but did not have "the practical legal ability to do so." *Id.* at 2. The court further concluded that Miller's interest was not in a "liquidated sum." *Id.* The court in *Galster v Woods (On Rehearing), supra,* 173 Cal App 3d 544, n 11, stated that *Miller* is nevertheless significant in that the appellate court, in reversing, relied in part on the recipient's lack of "practical legal ability to make" her interest in the realty available" and cited *Parson v Miller,* 90 Nev 126, 129-131; 520 P2d 607 (1974) (in light of uncertain state of title and unsuccessful effort to secure a loan against or sell an AFDC recipient's undivided fifty percent interest in real property, the resource did not appear marketable and hence a currently available resource).

resources. The United States Court of Appeals for the Ninth Circuit, construing the federal act and the Idaho regulation, held that it was contrary to the federal act for the secretary to prohibit grace periods or for Idaho to fail to provide therefor.[33]

We reverse the decision of the Court of Appeals, and remand to the trial court for further proceedings consistent with this opinion.

WILLIAMS, C.J., and BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with LEVIN, J.

RYAN, J. The primary issue presented for our consideration in this case is whether the Department of Social Services (DSS) erroneously determined that real property, owned but not occupied by plaintiffs, was a resource "available for current use" pursuant to 45 CFR 233.20(a)(3)(ii)(D) so as to make plaintiffs ineligible for benefits under the Aid to Families With Dependent Children (AFDC) program. I would hold that the DSS' determination does not violate the applicable state and federal statutes and regulations and, therefore, is not error requiring reversal.

Plaintiff Gary McKee and plaintiff Lucinda Johndro are unrelated persons, each of whom received AFDC benefits; McKee received benefits on behalf of himself and his two children, and Johndro received benefits on behalf of herself and one child. In April of 1981, McKee, and in July of 1981, Johndro, were notified by defendant that they were no longer eligible for AFDC benefits because each of them owned an interest in non-homestead real property having a market value in excess of the amount permitted by MCL 400.56g(1)(a); MSA 16.456(7)(1)(a). Plaintiffs sepa-

---

[33] *Schrader, supra.*

rately appealed that decision, and after the hearing referees upheld the terminations of benefits, they filed a joint appeal in the Bay Circuit Court. Both the Bay Circuit Court and the Court of Appeals affirmed the administrative hearing decisions of the Michigan Department of Social Services. 131 Mich App 422; 346 NW2d 105 (1984). We granted leave to appeal, 419 Mich 934 (1984), directing the parties to "include among the issues briefed whether plaintiffs' legal interest in real property is a resource 'available for current use' which precludes plaintiffs from being eligible for AFDC benefits."[1]

---

[1] In their complaint for injunctive relief and claim of appeal in the Bay Circuit Court, plaintiffs asserted that they were bringing this action on behalf of themselves and all other persons "who have been or will be denied AFDC benefits because they have ownership interest in real property which they are making a good faith effort to sell."

GCR 1963, 208.2(A) requires that within ninety days after filing of a complaint that includes class-action allegations, the plaintiff *must move* for certification that the case may be maintained as a class action. However, that requirement was part of an amendment that was effective April 1, 1983. Since plaintiffs filed their complaint and claim of appeal in 1981, it is not surprising that there was no motion for certification. See also MCR 3.501(B)(1)(a).

The language of plaintiffs' complaint and claim of appeal is couched in terms of a so-called "spurious class action" under former GCR 1963, 208.1(3), which was in effect in 1981 (*i.e.*, "the character of the right sought to be enforced is several and there is a common question of law or fact affecting the several rights and a common relief is sought"). Former GCR 1963, 208.4 allowed the court to order that notice be given, in such manner as it may direct, of the pendency of the action, of a proposed settlement, of entry of judgment, or of any other proceedings and actions, including notice to absent persons that they may come and present claims and defenses if they so desire. However, Rule 208 did not require certification.

There is no indication whatever that this case has proceeded as a class action, other than the title of the document filed. The Attorney General's answer to plaintiffs' complaint "denied" that plaintiffs could bring this action on behalf of others similarly situated. Counsel for the plaintiffs seemed to indicate that he knew of no other persons who would be entitled to relief. The trial judge apparently did not decide the class-action issue, and there is no indication that the issue was presented to him. On the basis of this record, I would decide this case not as a class action, but rather as an action by the named parties alone.

## I. Facts

### A. Plaintiff Gary McKee

McKee alleged that he resided with his wife and three children at their marital home located in Bay City, Michigan, until September, 1980. At that time, McKee left and, with two of his children, took up residence in a rental unit in Essexville, Michigan. He also asserted that from October, 1980, until March, 1981, his sole source of income was AFDC benefits. In March of 1981, McKee and his wife were divorced. Pursuant to the terms of the divorce decree, the marital home was to be sold and the proceeds divided evenly between the parties. Mrs. McKee was apparently granted exclusive use of the former marital home until it was sold.

On April 9, 1981, McKee was notified that he and his two children were no longer eligible for AFDC benefits because he owned nonexempt property valued in excess of the resource limitation for AFDC eligibility. The Bay County DSS had learned that McKee and his two children no longer lived in the marital home and thus determined that they were no longer eligible for AFDC benefits because McKee's interest in the former marital home was an available, nonexempt asset that exceeded the AFDC assets limit. The Bay County DSS determined, however, that McKee had no income, that McKee could not sell his home, and that closing his AFDC case would cause undue hardship. A policy exception was requested, but was denied by the state office in April, 1981, and McKee was then notified that his benefits would be terminated.

McKee filed a timely request for an administrative hearing on the termination of his AFDC benefits, and, pursuant to regulation 45 CFR

205.10(a)(6)(i), his benefits continued until the hearing decision was issued on June 29, 1981.

At a hearing held May 26, 1981, the hearing referee made, inter alia, the following findings of fact: McKee had been receiving AFDC for himself and two of his three children; under the judgment of divorce, the house was to have been sold and the proceeds divided between McKee and his ex-wife; on February 7, 1981, the parties had listed their house for $32,900, on April 9, they had reduced the asking price to $29,900, and on May 20, 1981, they had further reduced the price to $25,900; and *the parties had made a good-faith effort to sell their house, and continued to do* so. In his recommended hearing decision, the hearing referee concluded that, until McKee's property was sold, it could not be considered nonexempt property for the purpose of determining McKee's AFDC eligibility. Therefore, the hearing referee concluded that the DSS incorrectly decided to cancel McKee's benefits.[2]

---

[2] The conclusions of law of the hearing referee read as follows:

"The ADC program was established to provide financial assistance to needy and dependent children, 42 USC 601 *et seq.* The program is administered by the State of Michigan, through the department, pursuant to federal regulations, 45 CFR 200 *et seq.,* the Michigan Social Welfare Act, MCL 400.56; MSA 16.456, and the Michigan Administrative Code [1979 AC,] R 400.901 *et seq.*

"The Social Security Act directs the State to take into consideration in determining need, the resources of any child or relative requesting ADC. 42 USC 602(a)(7).

"The federal rules provide that in determining the need of recipients, net income available for current use and currently available resources shall be considered. Income and resources are considered available when they are both *actually* available and when the recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance. 45 CFR 233.20(a)(3)(ii)(D).

"Likewise, the Michigan Administrative Rules provide that only income and resources which are *available in fact for current use* are to be considered in determining the need of individuals for assistance and the amount of payment due them. [1979 AC,] R 400.12(25). See also [1979 AC,] R 400.12(22).

The Policy Hearing Authority of the DSS adopted the referee's findings of fact, but rejected his conclusions of law. It upheld the decision of the Bay County Department of Social Services to terminate McKee's benefits.[3]

---

"The Assistance Payments Manual departs from the standard established by the federal rules because it suggests that property is available when the applicant has a legal interest in the property and the legal ability to use or dispose of it. APM, Item 211, page 7. The Assistance Payments Manual does not incorporate the liquidated sum concept into the definition of availability which is found in the federal rules. The Manual rule is overly broad and, to the extent it exceeds the rules, is unenforceable.

"In this case, the land which claimant owns is not a liquidated sum. Therefore, in accordance with federal rule 45 CFR 233.20, the property cannot be treated as nonexempt property because it is not 'actually available.'

"In short, only property available in fact for current use by the recipient can be considered in determining the recipient's compliance with the ADC resource limit.

"Based on this review of the applicable law and regulations, the [hearing referee] makes the following Conclusions of Law:

"(1) Claimant's eligibility for ADC depends on his ability to meet the department's eligibility standards, including the $2,000 property resource limit.

"(2) Claimant's residence, which he owns jointly with his ex-wife, is not a liquidated sum. Therefore, it is not available in fact for current use.

"(3) Until claimant's property is sold, unless claimant or his wife interferes with the attempts to sell it, it cannot be considered nonexempt property for the purpose of determining claimant's eligibility for ADC.

"(4) The department has not established that claimant's home, which he owns jointly with his ex-wife, is nonexempt property."

---

[3]                     "Policy Hearing Decision

"This case is being decided by the undersigned Director of the Bureau of Administrative Hearings as the Policy Hearing Authority pursuant to the Delegation of Hearing Authority signed by DSS Director John T. Dempsey on April 1, 1981. The case was heard by Administrative Law Judge Jay W. Sexton pursuant to MCL 400.9; MSA 16.409 and MCL 400.37; MSA 16.437, upon a timely request for a hearing filed by the Claimant who disagrees with the Department's determination that the Claimant is not eligible for ADC based upon excess property. The presiding Administrative Law Judge believes that the Department policy is erroneous and, therefore, has made a Recommended Decision to the Policy Hearing Authority. It is the duty of the Policy Hearing Authority to make the final decision

pursuant to the April 1, 1981, Delegation on Hearing Authority.

"Issue

"The sole issue decided herein is whether the Department's policy to consider a house owned by the Claimant and his ex-wife as currently available where they have had the house listed for sale since February, 1981, and have been unable to sell it is valid.

\* \* \*

"Conclusions of Law

"45 CFR 233.20(a) provides the following:

" 'Requirements for State Plans. A State Plan . . . AFDC . . . must, as specified below:

" '(3)(i) Specify the amount and types of real and personal property, including liquid assets, that may be reversed [*sic* reserved], *i.e.,* retained to meet the current and future needs while assistance is received on a continuing basis. In addition to the home, personal effects, automobile and income-producing property allowed by the agency, the amount of real and personal property, including liquid assets, that can be reserved for each individual recipient cannot be in excess of two thousand dollars. . . .

" '(ii) . . . (D) Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance;

" '(E) Income and resources will be reasonably evaluated. Resources will be evaluated according to their equity value. . . . Equity value means fair market value minus encumbrances; . . . Liquid assets are those properties in the form of cash or other financial instruments which are convertible to cash . . . .'

"This requirement when taken in context clearly requires that the value of real property be considered in determining excess resources. It is not necessary that it be liquidated. The real estate involved here is 'actually available' since Claimant and his ex-wife are both willing to sell the property at the fair market value. 45 CFR 233.20(a)(3)(ii)(B) did not require that the resource be both currently available and liquidated. Rather it provides that an item is considered available when it is either actually available as in this case or a liquidated sum which can be made available in some legal fashion.

"The above analysis will lead to the conclusion that the Department's policy is not only proper but is actually mandated by the regulations since the resource is actually currently available. It may be that the fair market value has not been properly determined at this point in time. However, no one claims that its equity value is under $2,000.

"Decision and Order

"Based upon the above Findings of Fact and Conclusions of Law, it

On July 30, 1981, McKee appealed to the Bay Circuit Court. By stipulation of the parties, the action was dismissed without prejudice, and the matter was remanded for another administrative hearing to determine whether McKee's former wife had consented to lower the asking price of the property in question. The parties also stipulated that, pending final decision by the DSS, McKee's AFDC benefits were to be reinstated, effective the second half of July, 1981. The hearing referee issued a recommended rehearing decision on November 17, 1981, in which he found, inter alia, as a matter of fact: that on October 10, 1981, the parties had accepted a contingent offer to purchase in the amount of $19,900; that the parties had made a good-faith effort to sell their house, and continued to do so; that the DSS argued that McKee was still not eligible for AFDC benefits because of excess resources; and that McKee argued that the real property was not available and therefore not countable. The hearing referee also found that the rehearing had been requested to obtain information on the "ex-wife's role," but that the ex-wife did not appear to testify because she was not subpoenaed.

On rehearing, the hearing referee did not change, in any manner, his conclusions of law. (See n 2.) However, again the hearing referee's recommended rehearing decision was not adopted by the Policy Hearing Authority, which issued a decision and an order signed November 18, 1981, upholding the decision of the Bay County Department of Social Services.[4] The Policy Hearing Au-

_____

is the decision of the Policy Hearing Authority that the Policy of the Department is current and therefore the decision of the Bay County Department of Social Services should be and is upheld."

[4] McKee, apparently, reprints in his appendix the policy hearing

thority adopted the original conclusions of law
found in the order signed June 29, 1981, see n 3,
and, in addition, stated: "It is amply evident from
the Findings of Fact in the most recent decision
that the property is currently available and has
been available. . . . The law does not require that
real property be reduced to a liquidated sum be-
fore it can be considered excess property."[5]

decision. The ᴅss inferentially states that the policy hearing decision
reprinted at those pages is not the correct decision. The correct
decision, claims the ᴅss, is reprinted in its appendix. McKee has not
responded to the ᴅss' claim. I assume that the policy hearing decision
reprinted in the appendix of the ᴅss is the decision from which
McKee appeals. We note that the policy decision hearing reprinted by
McKee is favorable to McKee, and thus McKee would have no reason
to appeal.

[5]                    "Pᴏʟɪᴄʏ Hᴇᴀʀɪɴɢ Dᴇᴄɪsɪoɴ

"This case is being decided by the undersigned Director of the
Bureau of Administrative Hearings as the Policy Hearing Authority
pursuant to the Delegation of Hearing Authority signed by ᴅss
Director John T. Dempsey on April 1, 1981. The case was originally
heard by [hearing referee] Jay W. Sexton on May 26, 1981, pursuant
to MCL 400.9; MSA 16.409 and MCL 400.37; MSA 16.437. He issued a
Recommended Hearing Decision. The Policy Hearing Authority then
signed a Policy Hearing Decision on June 29, 1981.
"That decision was subsequently appealed to Circuit Court. On
August 11, 1981, the case was dismissed by the Circuit Judge in an
Order which remanded the matter to be heard before the Department
of Social Services, Bureau of Administrative Hearings, as to whether
or not the Plaintiff, Gary McKee, had currently available resources.
This was based upon a stipulation between the parties. As a result,
the matter was rescheduled before [hearing referee] Jay W. Sexton.
He then issued a Recommended Hearing Decision which would over-
rule Department policy. For this reason the matter is before the
undersigned for a decision.

                          "Issᴜᴇ

"Whether the ownership in real estate jointly with the ex-wife must
be liquidated before the property can be considered in determining
eligibility.

                      "Fɪɴᴅɪɴɢs ᴏꜰ Fᴀᴄᴛ

"The Findings of Fact of the presiding [hearing referee] as set forth
in the Recommended Decision are hereby adopted as my Findings of

The McKees sold their home in October of 1981, and Gary McKee received $2,000 as his share of the proceeds.

On December 3, 1981, McKee filed his claim of appeal and a verified complaint for injunctive and declaratory relief and for damages in the Bay Circuit Court.

## B. Plaintiff Lucinda Johndro

According to her complaint in the circuit court, Johndro and her husband owned a house in Sanford, Michigan. Prior to June 14, 1981, Johndro separated from her husband and moved from the home permanently with her son. In June, 1981, the Johndros listed their home for sale for $35,900

---

Fact and are incorporated herein by reference, except that it should be noted that the case was remanded to be heard by the Circuit Court rather than being a request by Central Office. This is clear in the Order of the Court. In addition, it must be noted that the original hearing decision found that Claimant's equity was in excess of $2,000 and the most recent Recommended Decision finds it in excess of $1,000. This is not to indicate a change of value but rather a change in the federal law which as of October 1 allows only $1,000 in nonexempt property for an ADC recipient as compared with $2,000 before October 1st. The exhibits in the record, together with Findings of Fact #3, clearly show that currently value is in excess of both limits.

### "CONCLUSIONS OF LAW

"The Policy Hearing Authority hereby adopts and makes a part of this Decision the original Conclusions of Law found in the Order signed June 29, 1981. [See n 3.] *It is amply evident from the Findings of Fact in the most recent decision that the property is currently available and has been available. In fact, both the Claimant and his ex-wife have accepted a contingent offer to purchase. The law does not require that real property be reduced to a liquidated sum before it can be considered excess property.*

### "DECISION AND ORDER

"Based upon the above Findings of Fact and Conclusions of Law, it is the decision of the Policy Hearing Authority that the policy of the Department is correct, and, therefore, the decision of the Bay County Department of Social Services should be, and is, upheld." (Emphasis supplied.)

—the indebtedness on the property was $14,000. Johndro admitted that her *"equity in the home is in excess of the resource limit of the AFDC program."*

On July 16, 1981, the Midland County DSS notified Johndro that she was no longer eligible for AFDC benefits. Johndro requested an administrative hearing, and the DSS' termination decision was upheld by the hearing decision on October 8, 1981. The hearing referee found that, on July 24, 1981, the asking price of the plaintiff's home had been reduced to $34,900. He further found that the parties had made, and continued to make, a good-faith effort to sell their house. In his conclusions of law, the hearing referee cited the Policy Hearing Authority's decision in *McKee,* and stated that he was bound by that decision. The hearing referee ordered the DSS to "close [Johndro's] AFDC benefits due to excess resources."[6]

---

[6] The Conclusions of Law provided in part:

"The Assistance Payments Manual (APM) states that in order to be eligible for ADC, the recipient's assets may not exceed $2,000. Assets include real property. A homestead is exempt when the recipient has lived in the home for six of the preceding 12 months and she plans to return to the home. APM, Item 211.

"The DSS Hearing Authority has reviewed the legality of the resource eligibility rules used by the department here. Register No. 81-09516(1026), mailed June 30, 1981 [*McKee*]. The [hearing referee] is bound by this decision.

"In the controlling case, the Hearing Authority stated the proper application of excess resource policy:

" 'This requirement when taken in context clearly requires that the value of real property be considered in determining excess resources. It is not necessary that it be liquidated. The real estate involved here is "actually available" since claimant and his ex-wife are both willing to sell the property at the fair market value. 45 CFR 233.20(a)(3)(ii)(B) did not require that the resource be both currently available and liquidated. Rather it provides that an item is considered available when it is either actually available as in this case or a liquidated sum which can be made available in some legal fashion.

" 'The above analysis will lead to the conclusion that the department's policy is not only proper but is actually mandated by the regulations since the resource is actually currently available. It may be that the fair market value has not been properly determined at

## C. Decisions Below

Plaintiffs McKee and Johndro, purportedly on behalf of themselves and others similarly situated (see n 1), filed a claim of appeal and complaint in the Bay Circuit Court. They claimed violations of both federal and state AFDC regulations. Johndro also requested that the court enter a preliminary injunction enjoining the DSS from denying her AFDC benefits.

A hearing on the motion for a preliminary injunctive order was held December 14, 1981. At that hearing, plaintiff asked for "certification of the class." Apparently that was never done. It became evident that McKee had received AFDC benefits throughout the hearing process and that he had not been deprived of any AFDC benefits as a result of the department's determination that he owned resources in excess of AFDC eligibility limits. The DSS contended that the *McKee* case was moot, but McKee's counsel stated that the case was not moot since, if that decision were not reversed, the DSS could attempt to recoup the overpayments. Although counsel for the defendant said that the inclination of the DSS was not to recoup, the circuit judge apparently made no ruling on the mootness issue.

Although Johndro sought preliminary injunctive relief, both parties essentially agreed that there were no material factual disputes and that the

---

this point in time. However, no one claims that its equity value is under $2,000.'

#### "DECISION AND ORDER

"Based on the Findings of Fact and Conclusions of Law stated above, the [hearing referee] decides that the department correctly calculated claimant's ADC eligibility.

"The [hearing referee] orders the department to close claimant's ADC due to excess resources."

matter was ripe for decision on the appeal from
the Policy Hearing Authority. Plaintiffs argued
that the policy of the DSS, as set forth in the
complaint (Item 211, Assistance Payments Man-
ual, see n 9), violated federal and state administra-
tive regulations. The DSS argued that federal law
required it, in determining AFDC eligibility, to
consider the equity value of real property owned
by the claimant.

The circuit court affirmed the administrative
decisions of the DSS by order entered January 26,
1982. It held that the DSS' decision contained no
erroneous findings of fact or erroneous conclusions
of law.[7]

---

[7] The opinion provides in pertinent part:

"It is our opinion that the Federal government in setting forth the
basis upon which they will support Aid to Dependent Children, and
the State in determining to proceed, are given the discretion to
determine on what basis public funds will be used for the support of
dependent children. There is no averment that any invidious discrimi-
nation is being practiced, nor that the actions involved here are
constitutionally infirm. Rather, the plaintiff contends that a clear
demonstrated need for assistance has been made and that the with-
holding of benefits is not justified in accordance with the application
of the law to the undisputed facts. We are cited only two authorities:
*Kanda v Chang*, 475 F Supp 368 (D Hawaii, 1979), and *Seigel v
Dempsey*, file number 80-004647-AA(S) in the Alpena Circuit Court
[decided October 15, 1981], which are holdings construing the applica-
ble regulations.

"Both of those precedents hold that the requirement that due
consideration be given to resources which are currently available is
not restricted only to liquid assets, that is, money or other assets
which can be devoted directly to the meeting of immediate needs,
such as clothing and food. We quote the following from the defen-
dant's brief, pages 7 and 8:

" 'The case of *Kanda v Chang*, 475 F Supp 368 (D Hawaii, 1979),
illustrates the lack of merit in Plaintiff's legal position. The Court
there held that real property need not be liquidated to be "currently
available." Indeed, the Court noted that real property *by definition* is
never a "liquidated sum." To be an available resource, the property
need only be free of legal impediment which would prevent sale. To
this effect, the Court said:

" ' "Equity in home property may not be considered as being a
reserved resource within the meaning of 45 CFR § 233.20(a)(3)(i)
unless that equity is currently available within the meaning of 45
CFR § 233.20(a)(3)(ii)(D).

Plaintiffs appealed to the Court of Appeals, which affirmed the trial court's order. 131 Mich App 422; 346 NW2d 105 (1984). The Court of Appeals began by rejecting defendant's threshold argument that the case was rendered moot by the sale of McKee's property. 131 Mich App 424, n 1. The Court then rejected plaintiffs' first contention that real estate interests were not "available for current use" because they had not been liquidated and because they could not readily be converted into cash, relying on *Kilpatrick v DSS*, 126 Mich App 559; 337 NW2d 576 (1983), as well as *Kanda v Chang*, 475 F Supp 368 (D Hawaii, 1979). The Court of Appeals relied on *Kilpatrick* for the prop-

" ' "When dealing with home property, the wording of this latter regulation is not particularly apt. 'A resource is considered available when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance.' The regulation applies to a variety of 'income' and 'resources' having a wide range of liquidity. Nevertheless, a common sense application of the regulation as applied to home property leads me to the opinion that equity in home property is currently available when there is no legal impediment to the immediate sale of the equity in the open market.

" ' "Plaintiffs point out that a listing for sale and an actual sale are not simultaneous events. A sale may not be consummated for many months. Yet this cannot be a factor in determining current availability. Firstly, by the very nature of the asset, real property would never be currently available if that meant being equivalent to cash in hand. Secondly, a depressed market situation would be reflected in ·fair market value. Thirdly, the regulation contemplates that home property within the maximum value allowed will not be sold but will be used as a residence by the assistance household." 475 F Supp 368, 380-381.'

"We are cited Judge Swallow's order in the cited case where he held that the decision of the [hearing referee] was to be affirmed in denying 'Plaintiff's application for ADC benefits for the reason that plaintiff's house in Minnesota was an available resource with an equity value in excess of $2,000.'

"The Department has clearly determined that 'actually currently available' means a resource which can be reduced to cash by actions that the owner has the legal right to do. The Department has not construed that requirement as being liquid assets or useful to meet immediate needs.

"It is our opinion that that decision is not an erroneous finding of fact or an erroneous conclusion of law and that decision is, accordingly, affirmed."

osition that the DSS must consider "available" any resource which may legally be sold for measurable value, even if the determined value is the result of depressed market conditions or a distress sale. The Court of Appeals cited the *Kilpatrick* case's acknowledgment that the result may seem unfair to those who may be forced to liquidate their realty interests under conditions of distress, but that that consideration went beyond the scope of the AFDC program and that a legislative response was required, not a judicial response.

Next, the Court of Appeals rejected plaintiffs' second contention that state law prohibited the defendant from considering plaintiffs' properties as "available" resources. Relying again on *Kilpatrick*, the Court stated that "[r]eal property is 'available in fact for current use' under this regulation so long as there is no legal impediment to immediate sale of the equity in the open market." 131 Mich App 426. As such, Michigan's regulatory scheme does not prohibit defendant from considering plaintiffs' properties in determining their eligibility.[8] The Court, therefore, affirmed the decisions below.

## II. ARGUMENTS OF PARTIES

In this Court, plaintiffs assert that a legal interest in real property cannot be considered "available for current use" unless the interest can be readily used to meet current needs. Specifically, plaintiffs argue: (1) that the plain meaning of 45 CFR 233.20 requires that only resources available

[8] The Court of Appeals also rejected the plaintiffs' final argument that they were denied procedural due process because of an irrebuttable presumption that their property could be sold and the proceeds used to support their families. Neither had there been any denial of substantive due process, the Court held. In this Court, plaintiffs do not make a due process challenge.

for current use to meet actual needs should be considered in determining AFDC eligibility and that that position is supported by the language of 1979 AC, R 400.12(10); (2) that in accordance with the expressed purpose of the AFDC program, only resources and income which are available to meet actual needs of a recipient should be considered in determining eligibility; (3) that judicial interpretation has held that the mere legal interest in real property, without consideration of its practical or actual availability, does not mean that interest is a resource "available for current use"; and (4) that the recent Congressional enactment of the Deficit Reduction Act of 1984 indicates Congressional recognition that prior law permitted unlimited "grace periods" for liquidation of available assets.

Defendant argues that it correctly applied *federal law* concerning the availability of resources in determining the plaintiffs-appellants' AFDC eligibility. The DSS does not argue the state-law issue; nor does it argue the mootness issue that it unsuccessfully asserted below.

### III. ANALYSIS

Both plaintiffs were denied AFDC eligibility because of an alleged policy of the Michigan DSS to consider a non-liquid asset owned by an individual as an "available asset" in determining AFDC eligibility despite the fact that the individual was making a good-faith effort to sell that asset. Since plaintiffs' interest in the real estate exceeded the monetary limitation for AFDC eligibility, and because plaintiffs' interest in the homes was non-homestead/nonexempt property, plaintiffs were deemed ineligible for AFDC benefits. Plaintiffs essentially contend that the defendant's policy, as expressed in the Assistance Payments Manual,

Item 211,[9] requires a more restrictive evaluation of

[9] The Assistance Payments Manual, Item 211, sets forth the policy of the DSS. Item 211 is quite lengthy. In pertinent part, it provides:

"MICHIGAN DEPARTMENT OF SOCIAL SERVICES
"ASSISTANCE PAYMENTS MANUAL

"Item 211   Subject ASSETS

"Date Rev. 8-29-80—Eff. 10-1-80

"LEGAL BASE:
"45 CFR 233.20(a)(3)
"PA 627, 1979
"Section 400.56 MCL
"Section 400.56g MCL
"Rule 400.12(17) Administrative Rules
"DEPARTMENTAL POLICY:
"In order to receive ADC, the ADC group and their responsible relatives living with them, must have combined total countable assets of no more than:
"1. $1,500.00 when the ADC group is composed of one member, or
"2. $2,000.00 when the ADC group is composed of two or more members.
"An unborn child is not considered an ADC group member in determining the asset limit.
"Only net assets which are available to the ADC group members are counted toward the asset limit. If this limit is exceeded, the excess is considered available for 30 days and ineligibility results for a minimum of two consecutive pay periods. Assets owned solely by an ineligible spouse of an ADC group member, who lives with the ADC group, are considered available to the spouse, but not to that spouse's children (i.e., step-children). The assets of an ineligible parent of an unemancipated minor member of the ADC group, who lives with the ADC group, are considered available to the minor, but not to the minor's children. If the ineligible spouse or parent is either a GA or an SSI recipient, their assets are excluded.

*   *   *

"ASSETS: Assets are cash; real estate property; life estates; life leases; vehicles; boats; tools; machinery; stocks; bonds; savings and loan, credit union and bank deposits; livestock; crops; land contracts; mortgages; promissory notes; accounts receivable; cash value of life insurance; trusts; securities; lump sums; uncashed checks; drafts and warrants; and revocable funeral agreements.
"Those items not considered assets include household goods used in the maintenance or occupancy of a home such as furniture, furnishings, appliances, carpets, utensils, televisions, audio equipment and household tools and equipment; and personal items such as clothing and jewelry.
"EXEMPT ASSETS Homestead. A person's Michigan homestead is not

counted as an asset. A person's homestead is the place that the person owns (or is buying) where he usually lives. If the homestead is not currently occupied by the client, it remains exempt if:

"1. the person has lived there for six of the preceding 12 months; and

"2. he plans to return.

"When these two conditions are met, the home (land, house, condominium or mobile home) remains exempt until completion of the next redetermination or until the client establishes a homestead, whichever occurs first.

When a person's home has been sold, or it is damaged, destroyed or condemned, that person may temporarily have cash and/or land in excess of the asset limit. Excess cash and/or land that results from one or more of the following situations, remains exempt until the next redetermination or until the person has established another homestead, whichever occurs first.

"The person's home has been sold and the cash from the sale has not been applied toward the planned purchase of another homestead.

"The person has received payment for the planned repair or replacement of his homestead and/or its contents.

"The land on which the person's home was remains available to the client for planned rebuilding.

"The land on which the person's home was is to be sold and the proceeds applied toward the purchase of another homestead.

"The land on which the person's home was has been sold and the cash from the sale has not been applied toward the planned purchase of another homestead.

"Parcels of land immediately adjoining the homestead are considered part of the homestead. This includes land that is interrupted only by a roadway or easement. Parcels of land that are not immediately adjoined to the homestead are not part of the homestead.

\* \* \*

"NON-HOMESTEAD REAL PROPERTY. *Non-homestead real property is real estate a person owns that is not part of his homestead.* This includes non-homestead life estates and life leases.

"*The value and availability of real property depends upon its equity value and type of ownership.*

"*Equity value is the property's fair market value minus all encumbrances and the costs to be incurred in the sale of the property.*

"Joint Ownership. If a person owns non-homestead property jointly with his spouse, and they live together, the total equity value is a countable asset for that person.

"*The person's share of non-homestead property held jointly with a non-spouse or a separated spouse, is calculated by dividing the value by the number of owners, unless otherwise specified in the document of ownership. If the client verifies that the other owners do not agree to the sale of the share, it is not available and none of it is counted toward the asset limit.*

"PERSONAL PROPERTY. Personal property is all property other than real property. This encompasses bank accounts, trusts, securities,

resource eligibility than is permitted by the federal and state regulations and is therefore invalid. In order to evaluate fully plaintiffs' claim, it is first necessary to explore some statutory and regulatory background.

### A. Plaintiffs' Federal Law Claim

### 1. AFDC Statutory and Regulatory Background

Aid to Families With Dependent Children, as Title IV-A of the Social Security Act, was enacted

> [F]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions of the State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . . [42 USC 601.]

> "The AFDC program is based on a scheme of cooperative federalism." *King v Smith,* 392 US 309, 316; 88 S Ct 2128; 20 L Ed 2d 1118 (1968). Established by Title IV of the Social Security Act

funeral agreements, vehicles, etc. Only the equity value of such items is a countable asset.

"Assets held jointly are considered totally available unless it is claimed and verified that a portion of the funds belong to the other owner(s) (*e.g.,* payee for an SSI recipient). The client's portion only is a countable asset.

"Jointly owned assets are considered not available if the client's share of the asset cannot be disposed of without the consent of the other owner(s) and the client claims and verifies that the other owner(s) does not agree to the sale of the client's share. None of the equity value of the asset is counted toward the asset limit." (Emphasis supplied.)

of 1935, 49 Stat 627, "to provide financial assis-
tance to needy dependent children and the parents
or relatives who live with and care for them,"
*Shea v Vialpando,* 416 US 251, 253; 94 S Ct 1746;
40 L Ed 2d 120 (1974), the federal program reim-
burses each State which chooses to participate
with a percentage of the funds it expends. § 403,
42 USC § 603. In return, the State must adminis-
ter its assistance program pursuant to a state plan
that conforms to applicable federal statutes and
regulations. § 402, 42 USC § 602. [*Heckler v
Turner,* 470 US 184, 189; 105 S Ct 1138; 84 L Ed
2d 138 (1985).]

The State, however, is afforded "broad discretion
in determining both the standard of need and the
level of benefits" [citing *Shea, supra,* 416 US at
253]. The state plan first establishes the statewide
standard of need, "which is the amount deemed
necessary by the State to maintain a hypothetical
family at a subsistence level," *Shea v Vialpando,*
416 US 253; 99 S Ct 1746; 40 L Ed 2d 120, and
then determines "how much assistance will be
given, that is, what 'level of benefits' will be paid,"
*Rosado v Wyman,* 397 US 397, 408; 90 S Ct 1207;
25 L Ed 2d 442 (1970). Both eligibility and benefit
amounts are determined by comparing income
with the state standard of need. If a family's
income "is less than the predetermined statewide
standard of need, the applicant is eligible for
participation in the program and the amount of
assistance payments will be based upon that differ-
ence" [citing *Shea, supra,* 416 US at 254]. [*Heckler,
supra,* p 189, n 3.]

Michigan, as a participant in the AFDC program,
has developed the required "state plan" for the
administration of the program. MCL 400.1 *et seq.;*
MSA 16.401 *et seq.* Pursuant to MCL 400.10; MSA
16.410, the Director of the DSS has been given
authority to promulgate rules in regard to the
AFDC program.

Both the statute and the federal regulation have

changed several times during the pendency of this action. The AFDC program, established by Title IV-A of the Social Security Act, 42 USC 602 *et seq.,* is administered by the DSS in accordance with the Social Security Act and the federal rules contained in 45 CFR Part 200, and pursuant to MCL 400.10; MSA 16.410, the state administrative rules, and departmental policies found in the Assistance Payments Manual (APM). Prior to October 1, 1981, 42 USC 602(a)(7) provided, in part:

> (a) A State plan for aid and services to needy families with children must . . . (7) . . . provide that the State agency (A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid.

Prior to October 1, 1981, this statute contained no specific resource limits. However, resource limits were prescribed by Department of Health, Education, and Welfare regulations pursuant to the secretary's authority under 42 USC 1302. Pursuant to 45 CFR 233.20(a)(3)(i)(A), the secretary prescribed that "[i]n addition to the home, personal effects, automobile and income producing property allowed by the agency, the amount of real and personal property, including liquid assets, that can be reserved for each individual recipient shall not be in excess of two thousand dollars." Thus, prior to October of 1981, there were no *statutory* limits on income for AFDC eligibility; rather, the limitation was set by federal *regulation.* Effective October 1, 1981, 42 USC 602(a)(7) was amended by the Omnibus Budget Reconciliation Act of 1981 (OBRA), PL 97-35; 95 Stat 859, to provide:

(a) A State plan for aid and services to needy families with children must . . .

(7) except as may be otherwise provided in paragraph (8) or (31) and section 615 of this title, provide that the State agency—

(A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid;

(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, but not including as a resource for purposes of this subparagraph (i) a home owned and occupied by such child, relative, or other individual and so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe . . . .

Thus, in October of 1981, by the passage of OBRA, Congress established *statutory* limits to be used in determining AFDC eligibility.

As of October 1, 1981, the promulgated federal regulation required that a state plan "[s]pecify the amount and types of real and personal property, including liquid assets, that may be reserved, *i.e.,* retained to meet the current and future needs while assistance is received on a continuing basis." 45 CFR 233.20(a)(3)(i). In addition, and more importantly, 45 CFR 233.20(a)(3)(ii)(D) provided:

A State Plan for . . . AFDC . . . must . . . (ii) Provide that in determining need and the amount of the assistance payment, after all policies governing the reserves and allowances and disregard

or setting aside of income and resources referred
to in this section have been uniformly applied: . . .

(D) *Net income available for current use and
currently available resources shall be considered;
income and resources are considered available
both when actually available and when the appli-
cant or recipient has a legal interest in a liqui-
dated sum and has the legal ability to make such
sum available for support and maintenance.*

(E) Income and resources will be reasonably
evaluated. Resources will be evaluated according
to their equity value.

For purposes of this paragraph (a)(3): . . . Equity
value means fair market value minus encum-
brances (legal debts); Fair market value means the
price an item of a particular make, model, size,
material or condition will sell for on the open
market in the geographic area involved . . . ; *Liq-
uid assets are those properties in the form of cash
or other financial instruments which are convert-
ible to cash and include savings accounts, checking
accounts, stocks, bonds, mutual fund shares, prom-
issory notes, mortgages, loan value of insurance
policies, and similar properties;* Need standard
means the money value assigned by the State to
the basic and special needs it recognizes as essen-
tial for applicants and recipients . . . . [Emphasis
supplied.]

The plaintiffs assert that the issue in the instant
case is whether the DSS violated 42 USC 602(a)(7)
and 45 CFR 233.20(a)(3)(ii)(D) (1981) when it deter-
mined that the houses, owned but not occupied by
plaintiffs, were "currently available resources"
within the meaning of the above federal regula-
tion. However, plaintiffs do not quote from the
above-cited regulation; rather, they cite the regula-
tion that amended it. The regulation which plain-
tiffs cite, 45 CFR 233.20(a)(3)(ii)(D) (1982), as pub-
lished in the Federal Register on February 5, 1982,
47 Fed Reg 5675, provides:

Net income, except as provided in paragraph (a)(3)(xii) of this section, and *resources available for current use shall be considered;* income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance. [Emphasis supplied.]

McKee's first hearing decision was issued June 29, 1981, the rehearing decision was issued November 17, 1981, the Policy Hearing Authority decision was issued November 23, 1981, and McKee's second complaint was filed in the circuit court on December 3, 1981. Johndro's hearing decision was issued October 8, 1981, and her complaint, along with that of McKee, was filed in the circuit court on December 3, 1981. Neither party argues the applicability of the law which they cite, and neither party argues that there is any substantive difference between the two regulations. As is apparent, the regulation in existence in 1981 provided that the state must consider "net income available for current use and *currently available resources . . . ,"* whereas the amendment, published in February of 1982, provides that state plans must consider "net income . . . and *resources available for current use . . . ."* Both regulations include the definition that "income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance."

Prior to the enactment of the OBRA, states were administratively allowed, in their discretion, to provide for grace periods for the disposition of nonliquid assets. While twenty-one states provided for such grace periods, Michigan was not one of

those states. After the passage of the OBRA, the Department of Health and Human Services, in November of 1983, changed its policy so as to prohibit the allowance of grace periods. See *Schrader v Idaho Dep't of Health & Welfare,* 768 F2d 1107, 1110 (CA 9, 1985); *Davis v Lukhard,* 591 F Supp 319, 321 (ED Va, 1984) (*app pending*).

The essential question for resolution is whether the DSS erred by making the determination to terminate plaintiffs' AFDC benefits because plaintiffs owned nonhomestead real property in excess of the AFDC eligibility limit. Plaintiffs claim that the DSS' determination to terminate their benefits is contrary to the plain meaning of 45 CFR 233.20 and, to a lesser extent, to Michigan's analogous administrative rule 1979 AC, R 400.12(7) and (10).

Plaintiffs do not contest the fact that the nonhomestead real property they owned had an equity value at or in excess of the AFDC eligibility limit. Plaintiffs argue rather that that nonhomestead real property was not an "available resource" within the meaning of either the federal or state regulations.[10]

During the period relevant here, there has al-

---

[10] Plaintiffs, at no place in their verified complaint for injunctive and declaratory relief and damages, asserted that the DSS unfairly valued their property. They only asserted that the DSS' policy requiring nonliquid assets, which they were making a good-faith effort to sell, to be included in determining eligibility is more restrictive than the federal and state rules. In fact, McKee and his former wife signed an agreement on October 19, 1981, acknowledging the receipt of $2,000 from the proceeds of the sale of the marital home by Gary McKee, and acknowledging the receipt of approximately $1,500 by McKee's former wife. Johndro admitted that her equity in real property was in excess of the resource limit of the AFDC program.

In addition, plaintiffs did not raise the valuation issue in any proceeding up through the appeal to the circuit court. However, at this Court, the plaintiffs assert that the concept of the "quick sale" liquidation of available resources is contrary to law and violates the intent and purpose of the AFDC program, and that the "quick sale" concept has no practical application in evaluating available resources. They further argue that the court's adoption of the concept of a "quick sale" price is in conflict with the prohibition against transfer

ways existed an exemption, either by statute or regulation, for homestead real property. Thus, until plaintiffs moved from the marital home (as a result of divorce or separation), their equity interests in their respective homes were exempt and thus were not "available assets" to be used in

---

of resources for the purpose of establishing AFDC eligibility as well as being contrary to the express purpose of the AFDC program. These arguments concerning "quick sales" or "distress sales" appear to be largely in response to the opinion of the Court of Appeals. In response to the plaintiffs' final argument in the Court of Appeals—that the DSS had denied them procedural due process by creating an irrebuttable presumption that their property could be sold and the proceeds used to support their families—the Court stated that the presumption that the properties could be sold was neither improper nor violative of due process. The Court of Appeals stated:

"There is no question that the properties involved here—or any real estate, for that matter—could be sold for some price, however depressed that price may have been as the result of market conditions or a distress sale situation. As long as the DSS uses this depressed valuation (rather than a valuation based upon hypothetical or ideal market conditions) in determining eligibility, there has been no improper reliance upon any inaccurate presumption of fact. The DSS has merely denied eligibility based upon a finding that the property could readily be sold for an amount exceeding the statutory ceiling.

"This is not a situation in which the DSS has denied eligibility based upon valuations which might have presupposed optimal market conditions. Plaintiffs would have had a stronger argument if DSS had based its denial of benefits upon a valuation which 'irrebuttably' presumed more favorable market conditions. Since the DSS's decision in the present case was not based upon any inaccurate presumptions regarding market conditions, and since there is no dispute that each of the plaintiffs' properties could readily be sold for some amount in excess of the statutory ceiling, we conclude that plaintiffs' procedural due process argument must fail." 131 Mich App at 427.

The Court of Appeals is accurate in asserting that there is no dispute that each of the plaintiffs' properties could readily be sold for a sum amount in excess of the statutory ceiling. That being said, the Court of Appeals comment on depressed market prices and distress sale situations is obiter dicta. I do not address or comment upon plaintiffs' arguments concerning "distress sale situations" because: (1) the issue of valuation of property was not contested below; (2) any comment by the Court of Appeals on distress sale situations is dictum; (3) the distress sale situation argument that was made at the Court of Appeals was discussed in context of the plaintiffs' claim that the defendant had denied them procedural due process by creating an irrebuttable presumption that their property could be sold and the proceeds used to support their families, *which argument is not made in this Court.*

determining AFDC eligibility. However, once plaintiffs moved from their marital homes, the exemption did not apply, and their equity interests in their former marital homes became nonhomestead real property, which is subject to the specified limitations in order to retain eligibility for AFDC.

## 2. Recent Statutory Amendment

Initially, I note that, because of a recent statutory enactment, plaintiffs would not make the same argument today. On July 19, 1984, Congress passed Public Law 98-369; 98 Stat 494, known as the Deficit Reduction Act of 1984 (DRA) (effective October 1, 1984). With the passage of that act, Congress amended 42 USC 602(a)(7)(B) to provide:

A State plan for aid and services to needy families with dependent children must—
* * *
(7) except as may be otherwise provided . . . , provide that the State agency—
* * *
(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, *but not including as a resource* for purposes of this subparagraph . . . .
* * *
(iii) *for such period or periods of time as the Secretary may prescribe, real property which the family is making a good-faith effort to dispose of,* but any aid payable to the family for any such period shall be conditioned upon such disposal, and any payments of such aid for that period shall (at the time of the disposal) be considered overpayments to the extent that they would not have been made had the disposal occurred at the beginning

of the period for which the payments of such aid were made.

The secretary then promulgated the current federal regulation which states:

> A State Plan for . . . AFDC . . . must
>
> \* \* \*
>
> (3)(i)(A) Specify the amount and types of real and personal property, including liquid assets, that may be reserved, i.e., retained to meet the current and future needs while assistance is received on a continuing basis. In addition to the home, personal effects, automobile and income producing property allowed by the agency, the amount of real and personal property, including liquid assets, that can be reserved for each individual recipient shall not be in excess of two thousand dollars.
>
> \* \* \*
>
> (B) in AFDC—The amount of real and personal property that can be reserved for each assistance unit shall not be in excess of one thousand dollars equity value (or such lesser amount as the State specifies in its State Plan) excluding only:
>
> \* \* \*
>
> (5) *Real property for a period of six months (or at the option of the State, nine months) which the family is making a good faith effort (as defined in the State plan) to sell subject to following provisions. The family must sign an agreement to dispose of the property and to repay the amount of aid received during such period that would not have been paid had the property been sold at the beginning of such period, but not to exceed the amount of the net proceeds of the sale. If the property has not been sold within the specified time period, or if eligibility stops for any other reason, the entire amount of aid paid during such period will be treated as an overpayment . . . .* [45 CFR 233.20(a)(3)(i)(A) and (B)(5) (1985). Emphasis supplied.]

Thus, Congress, by the enactment of the DRA of 1984, authorized the promulgation of regulations allowing a "grace period" of six or nine months in length, at state option, by which real property that a family is attempting in good faith to sell would not be included as an available asset for determining eligibility for AFDC benefits during the grace period. The regulation allows the state to define "good faith." Hence, if plaintiffs were attempting to receive AFDC benefits today, as long as they were making a good-faith attempt to sell their non-homestead real property, the value of that property would not be included in determining plaintiffs' eligibility for AFDC benefits during the grace period. The hearing referees, as well as the Policy Hearing Authority in *McKee,* found that the plaintiffs were making a good-faith attempt to sell the property in question. The DSS does not dispute that fact.

However, the DRA of 1984 has not been argued as applicable to the situation in 1981, and we must decide the instant case on the basis of the law in existence at the time these suits were first brought.

## 3. Application of the Regulation to the Facts

I begin, again, with the regulation that was in existence in 1981. That regulation required states to "[s]pecify a statewide standard, expressed in money amounts, to be used in determining . . . the need of applicants and recipients . . . ," and, in determining need, to consider all income and resources, excluding reserves and allowances, "in relation to the State's need standard . . . ." 45 CFR 233.20(a)(2)(i) and (3)(ii)(A). It also specifically required the state to consider "currently available resources":

Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance. [45 CFR 233.20(a)(3)(ii)(D).]

At issue, therefore, is whether the defendant erroneously determined, pursuant to 45 CFR 233.20(a)(3), 1979 AC, R 400.12, and the departmental policy Item 211, see n 9, that plaintiffs' interest in real property with a value in excess of the AFDC eligibility limits was a "currently available resource" or "actually available." The departmental policy, as set forth in Item 211, states that in order to receive AFDC, plaintiffs "must have combined total countable assets" of no more than $2,000. Assets are defined to include real property. Nonhomestead real property is defined as real estate that a person owns that is not part of his homestead. Item 211 also provides that the person's share of nonhomestead property held jointly with a nonspouse or a separated spouse, is calculated by dividing the value by the number of owners, unless otherwise specified in the document of ownership. If the client verifies that the other owners do not agree to the sale of the share, it is not available and none of it is counted toward the asset limit. In the case at bar, all parties agreed to sell the asset. Thus, it appears that defendant found that since all parties agreed to the sale, the nonhomestead real property was considered available and thus "countable" toward the asset limit.

Since it seems obvious that nonhomestead real property is not "net income," the question becomes, under the regulation, whether plaintiffs' interest in real property can be considered a "cur-

rently available resource." The regulation further provides that income and resources are considered available "both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance."

Clearly, plaintiffs do not have a legal interest in a "liquidated sum." Black's Law Dictionary (4th ed), p 1079, defines liquidated as "[a]scertained; determined; fixed; settled; made clear or manifest." At the time of the administrative hearings, plaintiffs' interests in this nonhomestead real property was anything but ascertained, determined, and fixed. Both plaintiffs had reduced the asking price on their real property, and both plaintiffs, it was found, were making good-faith attempts to sell their property.

Since the plaintiffs' real estate at issue cannot logically be considered "net income" or a "legal interest in a liquidated sum," the question, pursuant to the regulatory language, becomes whether plaintiffs' interest in nonhomestead real property is a "currently available resource" or whether that resource is "actually available." The Policy Hearing Authority found that the law did not require that the resource be both currently available and liquidated. It also found that the real estate involved here was "actually available" since all parties were willing to sell the property at the fair market value.

I agree with the defendant that the plaintiffs' interest in nonhomestead real property was actually available and was a currently available resource. I reject plaintiffs' invitation to hold that, while an AFDC applicant or recipient is making a good-faith effort to sell such property, the value of that property cannot be considered actually or currently available.

In the first instance, I believe that this particular regulation must be viewed in light of the surrounding regulatory provisions. A state plan is required to specify the amount and types of real and personal property, "including liquid assets," that may be reserved. 45 CFR 233.20(a)(3)(i). Clearly, liquid assets are but a subset of the types of real and personal property that may be reserved. Thus, real property, without regard to liquidity, is certainly contemplated as being a resource for consideration in determining the applicant's eligibility for AFDC benefits. The question then becomes whether the nonhomestead real property can be considered "actually available."

The sparse case law on this question does not provide a determinative answer.

Several federal district courts have been confronted with this issue, although under varying factual circumstances. Referring to the regulation in question, 45 CFR 233.20(a)(3)(ii)(D), the court, in *Kanda v Chang,* 475 F Supp 368, 381 (D Hawaii, 1979), stated:

> When dealing with home property, the wording of this latter regulation is not particularly apt. A resource is "considered available when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance." The regulation applies to a variety of "income" and "resources" having a wide range of liquidity. Nevertheless, a common sense application of the regulation as applied to home property leads me to the opinion that equity in home property is currently available when *there is no legal impediment to the immediate sale of the equity in the open market.*[42] [Emphasis supplied.]

Plaintiffs point out that a listing for sale and an actual sale are not simultaneous events. A sale

may not be consummated for many months. Yet this cannot be a factor in determining current availability. First, by the very nature of the asset, real property would never be currently available if that meant being equivalent to cash in hand. Secondly, a depressed market situation would be reflected in fair market value. Thirdly, the regulation contemplates that home property within the maximum value allowed will not be sold but will be used as a residence by the assistance household.

---

[42] Real property by definition is never a "liquidated sum."

---

*Kanda,* however, is factually distinguishable from the instant case because the plaintiffs in *Kanda* were not attempting to sell or convert the excess value of their residences into usable resources whereas, as found below, plaintiffs in the instant case were making good-faith attempts to sell their interests in their property. Notwithstanding the fact that the *Kanda* opinion is of limited utility in the analysis of the instant case, there is merit to the district court's assertion that, by the very nature of the asset, real property would never be "currently available" if that meant being equivalent to cash in hand.

Defendant also relies on the district court decision in *Schrader v Idaho Dep't of Health & Welfare,* 590 F Supp 554 (D Idaho, 1984). However, *Schrader* was reversed on appeal to the Ninth Circuit Court of Appeals. 768 F2d 1107 (CA 9, 1985). *Schrader* involved a challenge to an Idaho regulation adopted in November of 1983 revoking the grace period previously allowed under Idaho law for the disposition of nonliquid resources. The new regulation was adopted at the direction of the United States Department of Health and Human Services, which was a party defendant in the *Schrader* case.

The named plaintiff in this class action contended that Idaho's new regulation conflicted with the Social Security Act. The district court granted summary judgment for the defendants. The district judge noted that whether a "resource" is currently available is a fundamentally different question from whether "income" is currently available:

> The inquiry as to whether a "resource" is currently available is a more difficult inquiry. It cannot be disputed that some resources are more easily sold and converted to cash than others. To this extent, some types of resources are more currently available than other types of resources. However, it is also generally true that all resources have a price at which they may be liquidated. Even "hard-to-liquidate" resources may be converted to cash if offered at the right price. In this sense, hard-to-liquidate resources are resources which could be currently available to an applicant. Hard-to-liquidate resources must be distinguished from resources in which the applicant has no legal ability to convert to cash. [590 F Supp 559.]

The district court concluded that, if the applicant has the legal ability to dispose of a resource and use the proceeds toward current needs, the resource must be considered "currently available."

On appeal, the Ninth Circuit reversed the district court's grant of summary judgment for defendants. The Court of Appeals first noted the changes that the enactment of the OBRA and the DRA made in the AFDC program. The court then rejected the HHS secretary's argument that the post-OBRA policy of prohibiting grace periods resulted in administrative efficiency and discouraged potential AFDC families from sheltering resources in hard-to-liquidate assets, holding that this policy

did not comport with reality. 768 F2d 1110. Next, the court rejected the secretary's argument that by enacting the OBRA, Congress repealed grace periods sub silentio. The court was "not persuaded that HHS' purported 1983 about-face position on grace periods ha[d] sufficient support in the language or legislative history of the 1981 OBRA amendments." 768 F2d 1111. The court then concluded that the revised Idaho regulation which, inter alia, barred grace periods, did not satisfy the availability requirement of the Social Security Act.

The Court of Appeals stated that 45 CFR 233.20(a)(3)(ii)(D) did not change as a result of the OBRA. Holding that "[t]he final concomitant of the availability principle is that resources be reasonably evaluated," the court concluded:

> The combined requirements of 45 CFR, §§ 233.20(a)(3)(ii)(D) and (E) make it difficult to see how a resource can be considered available, and worth more than the $1,000 limit, when the fair market value of the property has never been established by buyers willing to pay a given price for it. [768 F2d 1112-1113.]

The court also held that the district court's analysis regarding "hard-to-liquidate" resources (quoted above) was unsound in two respects: First, it failed to give adequate weight to the requirement of 45 CFR 233.20(a)(3)(ii)(E) that resources be reasonably evaluated; on this point, the Court of Appeals agreed with Schrader's argument that, even if she had received offers of $1,000 or more for the real property, Congress, by enacting the OBRA, never intended to force her to liquidate that property at a fire-sale price. Second, the district court had erred in misreading the regulation as referring to an applicant's "legal right" to a resource or her "legal ability" to sell it. The Court of

Appeals held that HEW had rejected such an interpretation of "availability" in 1975 by not adopting a proposed regulation which stated that "income and resources are considered available both when actually available and when the applicant or recipient has a legal interest therein and has the legal ability to make them available but does not do so . . . ." 768 F2d 1112, n 5.

Finally, the Court of Appeals rejected the secretary's argument that the DRA, by codifying grace periods, "showed that Congress' pre-DRA intent must have been to deem nonexcluded real property interests to be currently available despite practical difficulties in disposing of them." Stating that "the views of a later Congress regarding the legislative intent of a previous Congress do not deserve much weight," 768 F2d 1114, the court held that the legislative history relied upon by the secretary was "too ambiguous" to support the secretary's contention that if the law prior to the DRA provided for a grace period, then the enactment of the DRA was a senseless act. The court stated that § 2626 of the DRA would be a sensible enactment if the prior law had permitted unlimited grace periods. 768 F2d 1115.

In conclusion, the court reversed the decision of the district court because, *inter alia,* it permitted Idaho to deny AFDC benefits to applicants who owned assets whose 'book value' exceeded $1,000 and who were attempting in good faith to sell the assets but had not yet been successful." *Id.* The court noted that, even if it accepted the district court's "right price" fire-sale analysis, the record did not show that plaintiffs received and rejected offers of more than $1,000. In the absence of such proof, an assumption that the real property "currently reduced its owner family's need by more than $1,000 was at least in part unverified, and

violated the Social Security Act and its requirement of demonstrable availability set forth in 45 CFR 233.20(a)(3)(ii)(D) and (E)." The court therefore reversed and remanded, directing the district court to consider on remand the effect of the DRA amendment on the relief sought by Schrader. *Id.*

I think that the Ninth Circuit's decision in *Schrader* is factually and legally distinguishable from the instant case. As noted above, pursuant to the pre-November, 1983, administrative policy of HHS permitting states to provide for grace periods, Idaho law had allowed for grace periods for the disposition of nonliquid assets. At issue in *Schrader* was the revised Idaho regulation, prompted by HHS' 1983 change in policy prohibiting states from providing such grace periods.

In contrast, our state, in its discretion, chose not to provide for grace periods. This was administratively allowed by HHS:

> Although the federal regulations did not specify a grace period for the disposal of non-liquid assets, States, which historically have been permitted to exercise discretion and reasonable flexibility in administering these regulatory requirements, sometimes opted to allow applicants and recipients a grace period for this purpose. In other words, the State could, in its discretion, disregard a non-liquid asset in computing a potential recipient's resources, thus giving that recipient a period of time in which to liquidate the asset. During the interim the asset was not considered an "available resource." [*Davis, supra,* 591 F Supp 321.]

McKee and Johndro were denied AFDC benefits pursuant to the DSS' policy in existence in 1981, which, inter alia, did not provide for grace periods. Since Michigan, unlike Idaho, never adopted regulations allowing grace periods before the OBRA was

enacted, I do not believe we need decide the precise issue presented in *Schrader:* whether HHS' 1983 change in policy *prohibiting* grace periods, and the revised state regulation adopted in compliance therewith, violated post-OBRA law. Therefore, while there may be language in *Schrader* supporting plaintiffs' position, I would find that case to be factually and legally inapposite.[11]

Decisions from two other state courts provide little guidance on the issue before us. *Miller v Stumbo,* 661 SW2d 1 (Ky App, 1983); *Galster v Woods (On Rehearing),* 173 Cal App 3d 529; 219 Cal Rptr 500 (1985). *Miller* is a two-page opinion containing very little helpful analysis. *Galster* arose after the 1981 OBRA amendments and involved a challenge to an April, 1982, change in policy by the California DSS. The California Court of Appeals examined the federal district court decisions in *Schrader* and *Davis,* as well as the Ninth Circuit decision in *Schrader.* It held that no deference was due the California DSS' interpretation of the relevant regulations, since the DSS' new policy "began abruptly in 1982, in response to the OBRA amendments to AFDC, and represents a complete about-face from years of prior administrative practice . . . ." Therefore, *Galster,* like *Schrader,* is distinguishable from the case at hand.

The Court of Appeals, as well as the defendant, relied on *Kilpatrick v DSS,* 126 Mich App 559; 337 NW2d 576 (1983). In *Kilpatrick,* the plaintiff con-

---

[11] I note that the same issue presented in *Schrader* is currently pending in the Fourth Circuit Court of Appeals. *Davis v Lukhard,* 591 F Supp 319 (ED Va, 1984) *(app pending).* The federal district court, which found in favor of defendants, the Virginia DSS and the federal HHS, noted that the question presented was a narrow one:

"Did OBRA alter the statutory and regulatory definition of 'resources' so as to include all of an applicant's resources, liquid or non-liquid, with no grace period allowed applicants to dispose of non-liquid assets and no dispensation given applicants who owned non-liquid assets thought to be incapable of disposition." *Davis, supra,* p 323.

tended that the policy as set forth by the Michigan administrative rules, as well as the APM Item 211, created a presumption, inconsistent with federal and state regulations, that mere ownership of nonhomestead real property makes that property available to the owner for AFDC purposes. The plaintiff claimed that it was impermissible to presume " 'that a nonsalable or nonmarketable resource is available to meet the needs of an indigent family,' " and that the value of the property in question, a saw mill, "should have been disregarded for purposes of determining her family's AFDC eligibility since the sawmill was not 'actually available' or 'available in fact for current use.' " *Id.* at 564-565. The Court of Appeals, relying on the discussion by the court in *Kanda, supra,* found that there was no conflict between DSS' policies and state and federal requirements of actual availability of resources for current use. The Court stated that there was no legal impediment to the sale of the property in question, and, "[a]bsent conflict with federal requirements, the state is free 'to insure that limited welfare funds be spent on behalf of those genuinely incapacitated and most in need.' " *Kilpatrick, supra* at 567, quoting *Pease v Director, DSS,* 105 Mich App 689, 699; 308 NW2d 432 (1981), *lv den* 412 Mich 940 (1982). The Court of Appeals found that, under the present system, judicial response was precluded and that any response to the plaintiff's situation must be a legislative response. *Id.*

I agree with the defendant that the Policy Hearing Authority's interpretation of the relevant regulations does not require reversal. The state AFDC plan must take into consideration income and resources of any child or relative claiming AFDC benefits. Resources clearly include real property. As noted by the *Kanda* court, real property would

never be actually available or currently available if those terms were construed to mean cash in hand. Here, there is no legal impediment to the sale of the nonhomestead real property, and, as such, the defendant did not err so as to require reversal by including the plaintiffs' interests in nonhomestead real property as an available resource in calculating plaintiffs' eligibility for AFDC.

My conclusion that the defendant's determination that the nonhomestead real property was an available resource is not error requiring reversal is supported, to some extent, by subsequent statutory enactments. As noted above, in 1984, Congress passed the Deficit Reduction Act of 1984, PL 98-369, § 2626; 98 Stat 1136, which amended 42 USC 602(a)(7). Moreover, as noted above, this amendment authorized a "grace period," for the first time, with respect to the AFDC program. The amendment allows the secretary of HHS to exclude, for such period or periods as may be determined, real property of which the family is making a good-faith effort to dispose, as a resource for the purpose of calculating available resources.

It is significant, as defendant points out, that prior to the Deficit Reduction Act, the Social Security Act contained no provision authorizing or requiring states to recognize a grace period; however, Title VI of the Social Security Act, which governs the SSI program, has such a statutory grace-period provision. 42 USC 1382b(b). The Conference Committee Report concerning the 1984 amendment to 42 USC 602(a)(7), House Conference Report 98-861, Joint Explanatory Statement of the Committee of Conference, explained that, under the pre-DRA law, real property was considered a resource available to the family both when actually available and when the applicant or recipient had a legal interest in the liquidated sum, and had

the legal ability to make the sum available for support and maintenance.

The Committee of Conference further stated that the House bill, which was not adopted, would exempt from the AFDC resource limitation, real property which the household was making a good-faith effort to sell at a reasonable price and which had not been sold. The agreement of the Committee of Conference states:

> The conference agreement follows the House bill with a modification *establishing* an AFDC policy on real property that is similar to SSI policy. The managers intend that by regulation, real property, which the family is making a good-faith effort to sell would be exempt for six months (with State option for an additional 3 months) but only if the family agrees to use the proceeds from the sale to repay the AFDC paid. Any remaining proceeds would be considered a resource. [H Rep 98-861, 98th Cong 2d Sess 1395-1396 (1984); 1984 US Code Cong & Ad News 2083-2084. Emphasis supplied.]

Although we are not called upon to construe the provisions of the Deficit Reduction Act of 1984, I would find it instructive that the modification of 42 USC 602(a)(7) was to *establish* an AFDC policy on real property similar to that found in SSI policy. This indicates to me, as is asserted by the Attorney General, that Congress, prior to the enactment of the DRA, had no intention of *requiring* states to provide a grace period during which time property that plaintiffs were making a good-faith effort to sell would not be counted as an available resource in determining AFDC eligibility. Although grace periods were *administratively allowed* by HHS before November 1, 1983, there is nothing in the statute or regulation to indicate that such grace periods were *required*. Indeed, the establishment

of *statutory* grace periods in the DRA of 1984 suggests that prior law did not mandate that states, as part of their AFDC program, adopt grace periods for the disposal of nonliquid resources.

I conclude therefore that DSS' decision that the real property at issue herein was "actually available" is not contrary to the plain meaning of 45 CFR 233.20(a)(3)(ii)(D). The plaintiffs agree that the real property in question was legally "available" to them. I agree with the Court of Appeals that the Policy Hearing Authority did not err so as to require reversal by including nonhomestead real property, which the plaintiffs were making a good-faith effort to sell, as an available asset in determining AFDC eligibility. Neither the statute nor the regulations compel a different conclusion, the sparse case law does not dictate a different conclusion, and, lastly, subsequent legislative history concerning the enactment of the Deficit Reduction Act of 1984 indicates that there was no pre-DRA requirement that participating states provide a grace period. I would decline plaintiffs' invitation to issue our own interpretation and declare that when an applicant or recipient is making a good-faith effort to sell their property, the value of the property is not available to them for purposes of determining AFDC eligibility. The DSS' determination that the plaintiffs' interest in nonhomestead real property was actually available is not error requiring reversal.

### B. Plaintiffs' State Law Claim

As noted above, the Director of the DSS is authorized to promulgate rules concerning the AFDC program. MCL 400.10; MSA 16.410. Pursuant to that authority, the Director of the DSS promulgated 1979 AC, R 400.12(10), which provides: "Only in-

come and resources which are available *in fact* for current use are to be considered in determining the need of individuals for assistance and the amount of payments to or for them." (Emphasis supplied.)

In this Court, plaintiffs make a brief argument that the above-quoted rule more fully recognizes the "actual availability" requirement, and that the insertion of the phrase " 'in fact' clearly suggests that more than the nascent ability to use a resource is intended."

I agree with the Court of Appeals that Michigan's regulatory scheme does not prohibit defendant from considering plaintiffs' nonhomestead real property in determining their eligibility for AFDC. 131 Mich App 426. The fact that the Michigan regulation has inserted the words "in fact" in the phrase "available for current use" does not alter our analysis under the federal regulation above. Plaintiffs' property is without legal impediment to immediate sale, and as such it is available in fact. Any other interpretation would not allow the inclusion of nonliquid assets as "available in fact for current use."

## IV. CONCLUSION

I conclude that the federal statute, the federal regulations, the Michigan statutes, and the Michigan Administrative Code do not require us to find that the DSS erred by determining, pursuant to Item 211 in the Assistance Payments Manual, that plaintiffs' equity interest in nonhomestead real property was actually available. Although the case law is not well developed, there is some authority for both plaintiffs' and defendant's positions. The statutory history preceding the Deficit Reduction Act of 1984 inferentially reveals no pre-DRA re-

*quirement* by the federal government that the states provide grace periods for the disposal of nonliquid assets. Indeed, after the 1984 amendment, 42 USC 602(a)(7) now provides *statutorily* for such grace periods.

I decline to judicially create a "grace period" wherein plaintiffs' AFDC eligibility would not be determined by including assets that plaintiffs were making a good-faith attempt to sell. The Legislature, by statute, or the Director of the DSS, by regulation, could have provided explicitly for the situation that occurred here. The current federal statute provides for it, and certain states provided for this situation prior to the passage of the OBRA of 1981. Michigan chose not to provide a grace period, either by statute or regulation, for the sale of nonliquid assets. I decline to provide such a grace period judicially. The DSS' determination that the nonhomestead real property herein was available is not error requiring reversal.

Accordingly, I would affirm the decision below.

RILEY, J., concurred with RYAN, J.